

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-13-00771-CR

Christopher **SMITH**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 158th Judicial District Court, Denton County, Texas
Trial Court No. F-2011-1675-A
Honorable Sherry L. Shipman, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:       Karen Angelini, Justice
               Sandee Bryan Marion, Justice
               Marialyn Barnard, Justice

Delivered and Filed:  December 23, 2014

AFFIRMED

A jury found appellant, Christopher Smith, guilty of murder and assessed punishment at twenty-five years' confinement. In four issues on appeal, appellant challenges the sufficiency of the evidence to support his conviction, and he asserts the trial court erred by denying his challenge to a venire member, denying his request for certain jury instructions, and admitting extraneous offense evidence. We affirm.

## SUFFICIENCY OF THE EVIDENCE

Appellant first asserts the evidence is insufficient to support his conviction.

### A.      Standard of Review

Evidentiary sufficiency challenges are reviewed under the standard set forth by the United States Supreme Court in *Jackson v. Virginia*: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010).  This requires us to assess the evidence in the light most favorable to the verdict. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson*, 443 U.S. at 319). We will uphold the verdict unless a rational factfinder must have had reasonable doubt with respect to any essential element of the offense.  *Laster*, 275 S.W.3d at 518; *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992).  We give deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318-19).

Each fact need not point directly and independently to the guilt of the accused, as long as the cumulative force of all the evidence, coupled with the reasonable inferences to be drawn therefrom, is sufficient to support the conviction.  *Id.*  Circumstantial evidence is as probative as direct evidence and may alone be sufficient to establish guilt.  *Id.*  We do not ask whether we believe the evidence at trial established guilt beyond a reasonable doubt, instead, we consider only whether the jury reached a rational decision. *Brooks*, 323 S.W.3d at 899.

### B.      Felony Murder

Appellant was accused of felony murder, which is an unintentional murder committed in the course of committing a felony.  TEX. PENAL CODE ANN. § 19.02(b)(3) (West 2011).  Penal

Code section 19.02(b)(3) provides that a person commits a first degree felony if a person "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." *Id.* In this case, the underlying felony offense was injury to a child. *See* TEX. PENAL CODE § 22.04 (West Supp. 2014).

Penal Code section 22.04 provides that a "person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child . . . (1) serious bodily injury; (2) serious mental deficiency, impairment, or injury; or (3) bodily injury." *Id.* In this case, the jury charge stated, in part, that "[Appellant], in Denton County, Texas, on or about April 4, 2011, committed or attempted to commit injury to a child by intentionally, knowingly, recklessly, or with criminal negligence causing bodily injury to Christian Smith . . . by act, to wit: by shaking Christian Smith, by striking Christian Smith with an unknown object, or by causing Christian Smith to strike an unknown object . . . ."

## C. The Evidence

The complainant, Christian Smith, was born on January 5, 2011, stopped breathing on April 4, 2011, and pronounced dead on April 8, 2011. Christian was the son of appellant and Shamira Smith.

Appellant and Shamira each had their own apartment, but they often stayed with each other. On the evening of April 3, 2011, Shamira and Christian spent the night at appellant's one-bedroom apartment, which he shared with his older brother Michael. Shamira testified Christian had been sick and had a stuffy nose for about a week leading up to April 4. On the morning of April 4, Shamira fed Christian and then prepared herself for work. Appellant drove Shamira, with

Christian in the car, to her job at a nearby school, and he then returned to his apartment with Christian. At the time, appellant was unemployed.

Appellant's brother Michael testified appellant used the bedroom in their apartment and he slept on the couch. Michael said he spent the evening of April 3 with his sister because she had a broken foot. He said he returned to the apartment on April 4 at around 2:20 p.m., and appellant had to let him in because the door's deadbolt was locked. Michael said it was a usual practice for them both to deadbolt the door. Michael said appellant was fine, his usual self, calm when he answered the door. Michael testified appellant answered the door shirtless, and he assumed appellant had been showering because he heard the shower running. Once appellant let him in, appellant returned to his bedroom and closed the door. Michael did not see Christian and assumed he was in the bedroom. In his statement to the police, Michael said he thought he heard Christian "cooing."

While appellant was in the bedroom, Michael was in another room doing laundry. After about five or ten minutes, Michael said appellant ran out of the bedroom "clutching [Christian] close to his chest," saying "Mike, I've got to go, he's not breathing, he's not breathing, and [appellant] ran out the door." Michael, who followed appellant, said appellant ran down one flight of stairs where "he broke down and cried." Michael got appellant to return to the apartment, where Michael laid Christian down and started CPR because appellant was not able to help because he "was panicking . . . he was crying." Michael told appellant to call the paramedics, and appellant said he already had called, but he called again. At trial, Michael said nothing came out of Christian's nose or mouth, although he could hear congestion in Christian's nose as he attempted CPR. But, in his statement to the police, Michael said milk came out of Christian's nose and mouth.

When the paramedics and police arrived, the police took appellant to the back room to ask him questions. Michael, who stayed with Christian, heard "a loud boom," and he saw that appellant had punched a hole in the wall because he was upset and crying. When the paramedics were able to recover a pulse from Christian, they transported him to a hospital in Plano. Christian was soon thereafter air-lifted to a hospital in Dallas. When the paramedics transported Christian, Michael followed them while appellant went to get Shamira from her place of employment.

Glen Bays, one of the firefighter/paramedics who responded to the call, said when they arrived at appellant's apartment, a man [later identified as appellant] was trying to get their attention. Bays described the man as "really agitated, really excited, yelling." Bays said Christian, who was wearing a onesie and a diaper, was unresponsive, not breathing, and very pale. Bays testified they asked appellant what happened and appellant said he had fed the baby and was getting him ready for his bath. Appellant also told the paramedics Christian had either a respiratory infection or a sinus infection for a couple of weeks. When asked whether appellant said what caused Christian to stop breathing, Bays responded: "No, he said he was just getting him ready for a bath and laid him down and found him nonresponsive." Bays described appellant as "very, very excited, kind of agitated and seemed almost borderline violent" as they worked on Christian, and appellant paced back and forth and yelled at them to do their job faster. Bays said paramedics recovered a pulse from Christian, although he was still not breathing on his own.

Tim Weaver, a Fire Department Captain and one of the first responders to arrive, also described appellant as extremely upset. When Weaver asked appellant what happened, appellant took Weaver to the bathroom and showed him a towel laying on top of a cabinet where appellant said he had changed Christian's diaper. Appellant told Weaver Christian stopped breathing as he was about to bathe the child. Weaver recalled appellant telling him Christian had liquid in his mouth. Appellant left the bathroom, and put his fist through a wall a few times, screamed and

"made aggressive motions" such that Weaver thought appellant might hit him, although appellant was not close enough to Weaver to do so. Weaver said appellant was very agitated when they first arrived, and appellant's behavior "frightened [him] for [his] crew, not so much for [himself]."

Another paramedic, John Whitener, described appellant as very emotional, very irate, and scurrying around all over the apartment. He could not remember who told him the child had stopped breathing six to seven minutes before they arrived. Whitener described Christian as not breathing, having no pulse, and the color blue. Whitener inserted a breathing tube into the child's lungs, at which time he noticed the airway was clear, with no signs of vomit, blood, or any other fluids. After securing the child's airway, the paramedics next inserted an IV in his neck to inject epinephrine in an attempt to restart his heart. After a second dose of epinephrine, they were able to regain a pulse.

Whitener said that as they worked on Christian, he noticed a laceration on the child's right foot in between the fourth and fifth toe. Whitener said the "pinky toe was almost falling off," and no one noticed it initially because the baby was not breathing or circulating blood. However, when they regained a pulse, the laceration began to bleed again in the ambulance. Whitener said there was no scab and agreed the laceration was "fairly significant." He said Christian's heart was beating on its own, but the child was not breathing on his own when they arrived at the hospital. During the drive to the hospital, the paramedics monitored Christian's blood oxygen level. Christian's was at 100 percent, which indicated to Whitener there was no lung disease, distress, or pneumonia.

The two police officers who responded to the emergency call also testified. One said he was unable to speak with appellant at the apartment because appellant was hysterical. This officer, who also drove to the hospital in Dallas, said appellant was disruptive when he arrived at the hospital. The other officer said he was able to speak briefly with appellant after the paramedics

transported Christian, and appellant told him he had laid Christian on the floor to feed him, and Christian suddenly stopped breathing at which time appellant used a baby plunger to try and clear the child's airway.

Police detective Richard Anders testified he went to the Dallas hospital along with another detective, Andrea Fisher. When he and Fisher arrived at the hospital, only Michael was in the emergency room. While the detectives spoke with Michael, appellant and Shamira arrived. Both detectives heard a disturbance in the hallway, and realized it was appellant yelling profanities and "storming around." Anders said appellant refused to speak to him and appellant said he would not speak to any social workers and he wanted to know Christian's condition. Anders recognized appellant was worried about the baby and he left appellant alone. A few minutes later, appellant approached Anders, apologized, and said he would speak with him. Anders said appellant spoke to him and Fisher willingly for a few minutes. Appellant told Anders about burns to Christian's backside, explaining that, in February 2011, he had attempted to bathe Christian in the sink and the water was too hot when he dipped the child—twice—in the water. Anders said the burns were significant and covered the child's buttocks, lower back, and around the back side of his legs.

Anders testified an officer who had been at appellant's apartment told him appellant said he was "sorry." When Anders asked appellant what he meant by this, appellant said that he had hurt his son and "it happened on [his] watch." Anders asked appellant if he hit Christian on anything or dropped him as he was running out of the apartment with the child, and appellant said "no." Anders said appellant described how he attempted to get Christian to start breathing again by holding Christian up under his armpits and "going back and forth," shaking the baby, without supporting the baby's head. Appellant said he then laid the baby on the counter, "put the butt down first and then the shoulders and then the head fell and he heard a thunk and [Christian] hit his head back on the wall . . . ." Appellant admitted turning Christian onto his stomach and slapping

his back, and he admitted "that he picked the child up using both of his hands around [the child's] neck to create a flow." Appellant told the detectives Christian did not fall off the counter or off anything else. Appellant also said Christian was recovering from his cold, and appellant did not think Christian was congested.

Anders testified he and Fisher then drove from the Dallas hospital to appellant's apartment where other officers were already on the scene. Anders said some of the evidence collected was not consistent with appellant's version of events. For example, appellant told the detectives he changed Christian's diaper and threw it in a trash can next to the toilet, but there was no diaper in the trash can or anywhere else in the bathroom. Instead, several dirty diapers were found in the kitchen wastebasket. Also, appellant said a towel he used was on the bathroom counter, but it was later found in the laundry room. Although appellant said he removed Christian's onesie in the bathroom, none were found in the bathroom. Appellant told the detectives he re-dressed Christian after he stopped breathing. Appellant said he fed Christian with a bottle while in the bathroom, but the bottle was on the kitchen bar countertop.[1] Appellant told the detectives he used a laptop in the living room, but one was found on top of the toilet in the bathroom.

Detective Andrea Fisher testified appellant appeared to be well-versed in how to care for an infant. She testified in a similar fashion to the inconsistencies between what appellant told her and Anders and what was actually found at the apartment. Fisher said that when appellant described Christian's head hitting the counter, appellant demonstrated by "actually hit[ting] his head back against the wall pretty hard, and then [appellant said], It sounded just like that." Fisher said appellant described the sequence of events as he used children's nose drops because Christian was congested, then suctioned his nose, after which the baby threw up, coughed, and stopped

_____

[1] A serology technician testified she found traces of blood on the bottom of the baby bottle.

breathing. Appellant tried CPR by pushing on Christian's chest, and then picked him up and shook him. Fisher testified she thought she heard the sound of a female crying in the background of the 911 call, but she conceded there was no female in the apartment.

Fisher was next asked about burns to Christian's right hand. She said appellant told her his son's right hand was burned when he (appellant) was attempting to feed Christian a bottle that had been heated on the stove. Appellant told Fisher he retrieved the bottle from the hot water on the stove and when he tipped the bottle to test the temperature of its contents, hot water on the outside of the bottle spilled onto Christian's hand. Fisher said she saw Christian's right hand when the child was at the hospital, and she described it as "blood on his fingers[,] four fingers of his right hand that appeared not to have skin[,] it was wrinkled and appeared to be a burn."

Fisher also testified about the sequence of calls and texts made to and from appellant's cell phone. She said the 911 call was made at approximately 2:22 p.m. Before that, Shamira had tried repeatedly and unsuccessfully to reach appellant, asking about Christian. After the 911 call but before he called Shamira, appellant called his brothers, his father, his bishop, and an employment agency. Approximately one hour after the 911 call, appellant finally called Shamira.

One of appellant's neighbors shared a wall between the two apartments. At approximately 1:00 or 1:45 p.m. on April 4, 2011, she heard "loud booming noises" or "thumping noises" from appellant's side of the wall. She did not know what caused the noise. A "significant time" later, she heard the emergency response vehicles idling in the parking lot. A downstairs neighbor testified that sometime between 1:00 p.m. and 2:00 p.m. on April 4, she heard "loud walking and then it sounded like somebody [or something heavy] dropped" on the floor above her apartment. About fifteen to thirty minutes later, she heard sirens and she heard someone say "hurry up, he's not breathing."

Doctor Michael Cowan, a pediatric emergency physician, said he saw Christian when the child first arrived at the Plano hospital and Christian had no spontaneous respirations, a very faint pulse, fixed and dilated pupils, and was not neurologically responsive. Cowan noticed bruising around Christian's eyes, which he believed was recent. Cowan agreed symptoms from head trauma manifest quickly, and Christian's injuries and symptoms were not consistent with resuscitative efforts. However, he admitted he could not date the bruises or state what caused the bruises. Christian also had a subdural hemorrhage, which Cowan said would not be caused by someone laying a baby on a folded-over towel on a counter-top. Cowan agreed a subdural hemorrhage of the type he saw on Christian would be caused by a "significant kind of trauma" and a subdural hematoma retinal hemorrhage also could be caused by blunt force injuries. Cowan agreed, however, that a lack of oxygen also could cause the brain to swell.

The day after Christian was admitted to the hospital, the trauma team asked Dr. Amy Barton, a child abuse pediatrician, to consult on Christian's case. In addition to examining Christian, Barton spoke to Shamira, who told Barton she took the child to a doctor on March 29 because of his cold and that Christian had sustained a burn to his hand the following Wednesday or Thursday. Shamira said they did not seek medical treatment for the burn, but they applied a burn cream to his hand. Shamira also told Barton that Christian was eating better than he had been and cooing. Barton found this significant because eating well and cooing means the child feels well.

Barton next testified about several photographs she took of Christian. One of the photos showed a bruise over Christian's left eye, which Barton said would be the result of "some sort of blunt force, direct contact to the eyelid." Other photos showed burns to both the front and back of Christian's right hand fingers. Barton said the significance of the fact that only the fingers, and not the palm, were burned is "that when someone sustains a splash injury . . . you see splotches of

- 10 -

water or dots of water that go down your hand or leg." She continued: "A line of demarcation is consistent with immersion burn or the hand being placed in water up to that exact line. And then the burn extends only to that line and not above it." As to Christian specifically, Barton testified this "mean[t his] fingers themselves were burned and dipped in something." She believed the burns were new, and some were second degree and others third degree.

Barton also testified about Christian's head injury, stating a brain scan showed a subdural hemorrhage in the front of his brain in the forehead area. Barton said a subdural hemorrhage can be caused either by a blunt impact to the head or a rapid back and forth movement of the head, but not by normal resuscitative efforts such as CPR. "[S]omething severe and traumatic" would cause a subdural hemorrhage such as Christian's. Barton said Christian also had hemorrhaging to the back part of one of his eyes, and such injuries are associated with inflicted head injuries. Christian also had bruising to both eyelids, which indicated "some sort of blunt force injury to those eyelids to cause bruising." Barton explained "inflicted head injury" to mean that something was done to Christian, such as "[s]haking, slamming, throwing or being hit with an object." Finally, Barton stated she saw bruising on Christian's upper arms, consistent with a violent hand-hold. Barton said dating the bruising would be very difficult. Barton said Christian ultimately was declared brain-dead and taken off life-support.

Doctor Darlene Kurian, who was Christian's pediatrician, testified she saw Christian at his two-month wellness check-up on March 10, 2011, at which time all milestones were normal, and nothing of concern appeared in Christian's birth record or at the March 10 appointment. She said Shamira did not indicate any major health concerns or that anything was wrong with the child. However, when Kurian removed Christian's clothes for a head-to-toe examination, Kurian saw old burns on his buttocks. She said the left buttock had what appeared to be second-degree burns

in three areas that were in the process of healing, and an already-healed burn on the right buttock. Shamira told Kurian the burns were being treated by another pediatrician.

Kurian saw Christian again on March 29, 2011 because he had a stuffy nose, this time with appellant present and Shamira on a speaker phone. Kurian said at the time there was no indication of any respiratory problem, but she diagnosed him with an acute upper respiratory infection. Kurian recommended to appellant the use of saline nose drops and suctioning of the nose. Based upon her March 29 examination of Christian, Kurian would not have expected him to stop breathing; however, she agreed suctioning a child's nose may cause the child to stop breathing for a few seconds. Nor would she expect an infant to vomit and then immediately become lifeless. Kurian denied being told about any bloody mucous discharge, and she did not remember being asked about suctioning Christian's mouth. She said her own examination of Christian did not reveal any bloody mucous discharge in his nose or mouth, nor any bloody scabs or crusting in his nose. Kurian said she would not expect an infant who had stopped breathing to have a subdural hematoma or retinal hemorrhaging.

Dr. Jill Urban, the medical examiner/forensic pathologist, testified she would not expect to see as much blood diffused over Christian's brain, or an impact site caused by something hitting his head or his head hitting something if he had "just stopped breathing." Instead, Urban stated a "forceful event" would have caused bleeding in Christian's skull and the impact site. Urban recognized Christian's injuries as child abuse because "a great deal of force . . . would have been applied to this child, and a reasonable person would know that it was too much." According to Urban, a person performing CPR on Christian would not have caused his head injuries. Urban believed Christian suffered at least one blow and possibly more. She said the hemorrhage in the scalp and the subdural hemorrhage were not consistent with the child spontaneously stopping breathing. Urban also believed the burns to Christian's fingers were consistent with his hand being

immersed in hot liquid. She also observed healing burns to Christian's buttocks and lower back. Urban concluded three-month-old Christian died as a result of blunt force injuries. She ruled the manner of death to be homicide because Christian's injuries were consistent with being inflicted by someone else.

During his case-in-chief, appellant called Dr. Thomas Young, a forensic pathologist, to testify. Young stated the theory that shaking a baby causes lethal brain injury has not been substantiated in any reasonably scientific manner. Young said many studies over the years have demonstrated that shaking a child with one's hands does not generate the type of force that will cause brain injury. Young testified that even minor handling of a child, such as retracting the eyelids to look at the eyes, may cause an area of bleeding beneath the skin because the child's blood-clotting system is being destroyed by whatever is happening in the brain. Young noted Dr. Urban found no damage to Christian's neck and spine, which is inconsistent with shaking a baby. Young stated the physical evidence with regard to Christian's head was not consistent with a traumatic, violent event. He also stated a life-threatening event, such as a child suddenly stopping breathing, is rare but can happen. Young testified that shaking someone to wake them up—as appellant told the police he did to revive Christian—does not "come anywhere even in the same ballpark of the kind of forces that would cause brain damage from shaking." As to the burns on Christian's hand, Young said the burns were consistent with both immersion and non-immersion.

After reviewing the record, we hold that the evidence was sufficient to support appellant's conviction. The evidence is undisputed that appellant was the only adult in possession of Christian at the time he stopped breathing. When an adult defendant has had sole access to a child at the time its injuries are sustained, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies. *See Bryant v. State*, 909 S.W.2d 579, 583 (Tex. App.—Tyler 1995, no pet.) (where evidence showed child had been left alone with defendant and injuries to child

occurred approximately thirty minutes prior to child being brought to emergency room, evidence was sufficient to support conviction); *Elledge v. State*, 890 S.W.2d 843, 846-47 (Tex. App.—Austin 1994, pet. ref'd) (undisputed medical testimony placing adult defendant alone with child when fatal injuries were sustained supported conviction for injury to a child); *Butts v. State*, 835 S.W.2d 147, 151 (Tex. App.—Corpus Christi 1992, pet. ref'd) (injuries sustained by child established by medical testimony to have occurred at time adult defendant admitted to sole possession of child).

Also, the jury could have reasonably inferred a consciousness of guilt based on Shamira's unsuccessful attempts to reach appellant, his calling several people after the 911 call before he called Shamira, and his waiting almost an hour after the 911 call to finally call her. "Consciousness of guilt" is "a well-accepted principle that any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he committed the act with which he is charged." *See Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no writ) (citation omitted) (noting that consciousness of guilt is one of strongest types of evidence of guilt).

Finally, the jury was entitled to believe the medical testimony that Christian suffered a significant trauma to his head, and the trauma was caused by an "affiliated head injury" as opposed to him merely stopping breathing. The evidence is undisputed that Christian was already unresponsive when the paramedics arrived at appellant's apartment, within minutes of the 911 call, and the examining physicians agreed the child's injuries were consistent with a trauma that had been incurred within minutes of the time paramedics arrived.

We conclude the jury was rationally justified in finding appellant guilty beyond a reasonable doubt.

**VENIRE CHALLENGE**

In his second issue, appellant asserts the trial court erred by denying his challenge for cause of one of the venire members. Appellant contends the venire member, Stephen Finley, demonstrated bias based on his dislike of defense counsel on two occasions: first, Finley indicated he did not like counsel's insinuation that he had a bias against black people; and second, Finley agreed he had "checked out" and would hold her being appellant's mouthpiece against appellant.

**A.      Venire Questions**

During voir dire, the following exchange occurred between defense counsel and Finley:

Counsel: . . . we have the right to come into a courtroom and have a jury of our peers, okay, assess all the facts and the evidence and judge our case.

    And my concern as I look myself, as I look at folks sitting on this side of the bar and sitting on this side of the bar is that. Because [appellant] is a young black man. Rightly, wrongly, I don't know, I know it's 2013, and I probably shouldn't have that inclination at all, but the truth is I am concerned about that for him. And it's probably uncomfortable, Mr. Finley, talking about it, I know it is for [appellant], [appellant's] the most uncomfortable in the room, what do you think about it?

Finley: Well, I didn't even think about it until you brought it up. Are you insinuating - -

Counsel: No, no.

Finley: See what I mean? Something I hadn't even thought about until you brought it up.

Counsel: Yeah, because that fact shouldn't make a hill of beans anywhere at all and shouldn't be noticed, right?

Finley: Right, and you're the one bringing it up, though.

Counsel: Okay. No and I've only had concerns, and I bring it up only because I've had 60 people before and maybe 59 are good with it, don't think a thought about it, but maybe there is 1 person that does and I feel if we don't know about it, that's unfair to [appellant]. That's happened before and that's the truth of it.
I want to ask, does that fact matter to anybody? Yes, sir?

. . .

Counsel: [Later in discussing being a good parent] Like you try to do everything the right way and it just doesn't happen sometimes. But that there are good parents, right?

Potential jurors: Yes.

Counsel: Mr. Finley, what makes you a good parent?

Finley: Hard to say.

Counsel: Have you checked out on me?

Finley: Yes.

Counsel: That's honest. Let me ask you this, then, if I can have your attention for about 20 more seconds: Are you going to be able to give [appellant] a fair and impartial trial, in spite of the fact that you may not - - that I may be his mouthpiece, and you're not going to hurt my feelings?

Finley: Probably not.

Counsel: Okay. Fair enough. Okay. Is there anybody that feels like Mr. Finley at this point? . . . .

Defense counsel later challenged Finley for cause, and the trial court denied the challenge.

## A.     Standard of Review

When reviewing the denial of a challenge for cause, we examine the record of the voir dire to determine if there is sufficient evidence to support the trial court's ruling. *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002). We review the trial court's ruling with "considerable deference" because it is in the best position to evaluate a venire member's demeanor, attitude, and tone of voice. *See Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007). We grant the trial court particular deference when the prospective juror's answers are "vacillating, unclear or contradictory." *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004); *Feldman*, 71 S.W.3d at 744. However, "[t]he record need not establish a venire member's bias with unmistakable clarity" to support a challenge for cause. *Barefield v. State*, 784 S.W.2d 38, 44 (Tex. Crim. App. 1989).

A venire member may be challenged for cause for having a bias for or against the defendant, or against the law. TEX. CODE CRIM. PROC. ANN. art 35.16(a)(9), (c)(2) (West 2006); *see also Sadler v. State*, 977 S.W.2d 140, 142 (Tex. Crim. App. 1998) (interpreting "bias against the law" to mean "refusal to consider or apply the relevant law"). Bias is considered an inclination toward one side rather than to the other. *Anderson v. State*, 633 S.W.2d 851, 853 (Tex. Crim. App. 1982). Bias exists as a matter of law when a prospective juror admits that he is biased for or against a defendant. *Id.* When a venire member is shown to be biased as a matter of law, he must be excused when challenged, even if he states that he can set his bias aside and provide a fair trial. *Id.*; *see Smith v. State*, 907 S.W.2d 522, 530 (Tex. Crim. App. 1995). When bias is not established as a matter of law, the trial court has discretion to determine whether bias actually exists to such a degree that the prospective juror is disqualified and should be excused from jury service. *Anderson*, 633 S.W.2d at 853. However, it is left to the discretion of the trial court to initially determine whether such a bias exists and the court's decision will be reviewed in light of all of the answers given. *Anderson*, 633 S.W.2d at 853. In deciding on the propriety of the court's ruling on challenges for cause during voir dire, we keep in mind that the trial judge has had the opportunity to observe the tone of voice and demeanor of the prospective juror in determining the precise meaning intended, while we have only the "cold record." *Briddle v. State*, 742 S.W.2d 379, 384 n. 1 (Tex. Crim. App. 1987), *indirectly overruled on other grounds*, *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996).

## B.    Analysis

We conclude appellant did not satisfy his burden. First, the significance of Finley's answer that he had not thought about race until counsel brought it up is unclear. Second, Finley's answer "Probably not" when asked if he could give appellant a fair and impartial trial in spite of the fact that counsel was appellant's "mouthpiece" does not establish bias as a matter of law. Finally,

because Finley's alleged bias was not explored after he gave his initial answers, we cannot say bias actually existed to such a degree that he was disqualified and should be excused from jury service. On such a "cold record" we must give deference to the trial court's voir dire ruling when the trial court heard Finley's tone of voice and observed his demeanor. Accordingly, we cannot conclude the trial court abused its discretion by denying appellant's challenge for cause.

## JURY INSTRUCTIONS

In his third issue, appellant asserts the trial court erred by denying his request for a jury instruction on criminally negligent homicide, or, alternatively, erred in denying his objection to the inclusion of *mens rea* language relating to criminal negligence in the underlying injury-to-a-child portion of the charge.

### A.    Instruction on Criminally Negligent Homicide

After the defense rested its case, but before the State offered rebuttal witnesses, the trial court and attorneys discussed the jury charge. Appellant's attorney asked for an instruction on criminally negligent homicide as a lesser-included offense. The State responded that if the court granted that request, then the State wanted an instruction on manslaughter as a lesser-included offense. The trial court then asked defense counsel if she had an objection to a manslaughter instruction, to which she responded that she wanted to think about it. The trial court decided to allow everyone an opportunity to consider and research the requests, and asked the State to prepare a charge that included both requested instructions and everyone would reconvene after the State put on its rebuttal witnesses to finalize the charge.

The next day, because the rebuttal witness was late, the trial court called a recess, and at some point an "Off-the-record initial charge conference" was held. After the rebuttal witness testified, the trial court again called a recess and informed the jurors the next order of business was to finalize the charge. The court told the jurors "while you were on recess this morning, all these

attorneys and I have worked very hard to get that as close as we can." The trial court excused the jurors and then asked the attorneys "[a]nd so by way of a formal charge conference, if you will let me know what your current objections are to this version of the charge. The Court will take a position it's in a substantially final form, at this point." Defense counsel did not mention, request, or object to the lack of an instruction on criminally negligent homicide.

Although appellant initially requested an instruction on criminally negligent homicide as a lesser-included offense, the record does not contain any ruling by the trial court or an objection by defense counsel to the lack of such an instruction. Therefore, appellant has not preserved his complaint for our review. TEX. R. APP. P. 33.1(a).

### B.    *Mens Rea* **Language**

During the charge conference that occurred after the rebuttal witness, defense counsel renewed her objection to the inclusion of the *mens rea* "criminal negligence" in this instruction: "A person commits the offense of injury to a child if he intentionally, knowingly, recklessly, or with criminal negligence, by act, causes bodily injury to a child." On appeal, appellant argues the trial court erred by including this phrase because the Texas Pattern Jury Charge does not include the phrase.

We use an abuse of discretion standard in reviewing a trial court's decision to submit or refuse a jury instruction. The Texas Penal Code states a "person commits an offense if he intentionally, knowingly, recklessly, *or with criminal negligence*, by act or intentionally, knowingly, or recklessly by omission, causes to a child . . . (1) serious bodily injury; (2) serious mental deficiency, impairment, or injury; or (3) bodily injury." TEX. PENAL CODE ANN. § 22.04(a) (West Supp. 2014) (emphasis added). A jury charge, such as the one here, that tracks the language and definitions of the Texas Penal Code is not error. *See Martinez v. State*, 924 S.W.2d 693, 699 (Tex. Crim. App. 1996) (holding that a jury charge tracking language of particular statute is proper

- 19 -

charge because "[f]ollowing the law as it is set out by the Texas Legislature will not be deemed error on the part of the trial judge"). Accordingly, we conclude the trial court did not err in submitting the instruction it did.

## EXTRANEOUS OFFENSE EVIDENCE

In his final issue, appellant asserts the trial court erred by admitting evidence of burns on Christian's buttocks, back, legs, and foot because the evidence was irrelevant and more prejudicial than probative.[2] Appellant argues the evidence was not relevant because this incident was investigated by law enforcement, determined to be an accident, and the investigating agency intended to request a "no bill" from the Dallas grand jury hearing the case but the Denton County District Attorney's Office specifically asked the agency to hold the case pending the outcome of the underlying criminal trial.[3] Appellant also asserts the evidence of the burns lacked any probative value and had the potential to affect the jury in an irrational and indelible way.

A trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse of discretion standard. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). As long as the ruling of the trial court is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's ruling will be upheld. *Id.* If the evidentiary ruling of the trial court is correct on any theory of liability applicable to that ruling, it will not be disturbed. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Generally, extraneous offense evidence is not admissible at the guilt-innocence phase of a trial to prove a defendant committed the charged offense in conformity with his bad character.

---

[2] On appeal, appellant does not challenge the trial court's admitting evidence of burns to Christian's fingers.

[3] Detective Samuel Todd testified he investigated the burns to Christian's backside that occurred on February 5, 2011. He said he did not typically handle child abuse cases, he believed the injury was accidental, and when asked whether he believed the injury was intentional, he replied, "Not at the time." He testified the case was on hold, and he acknowledged the incident occurred before Christian's hand was burned and he stopped breathing.

TEX. R. EVID. 404(b); *Devoe*, 354 S.W.3d at 469.  However, this evidence may be admissible when it has relevance apart from its character conformity.  *Devoe*, 354 S.W.3d at 469.  "For example, it may be admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  *Id.*  Whether it has relevance apart from its character conformity is a question for the trial court.  *Id.*  Even if the evidence is relevant apart from its character conformity, it still may be excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice.  *Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003); *see also* TEX. R. EVID. 403.

"In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.36(a) (West 2005).  Notwithstanding Rule 404, in cases involving injury to a child, "evidence of other crimes, wrongs, or acts committed by the defendant against the child who is the victim of the alleged offense shall be admitted for its bearing on relevant matters, including: (1) the state of mind of the defendant and the child; and (2) the previous and subsequent relationship between the defendant and the child."  *Id.* art. 38.37, § 1(a), (b) (West 2014)

The Court of Criminal Appeals, noting that it is probably "better to be consistent than right," has held that "a simple plea of not guilty does not make issues such as intent relevant issues of consequence for . . . Rule 404(b) purposes . . . ."  *Robbins v. State*, 88 S.W.3d 256, 261 (Tex. Crim. App. 2002).  But cross-examination of the State's witnesses or presentation of various defensive theories can place intent at issue.  *Id.*

In *Robbins*, the defendant suggested through vigorous cross-examination of prosecution witnesses that the victim's death was not the result of an intentional act by appellant, the victim could have died from Sudden Infant Death Syndrome, he was treating the victim "kindly" with the obvious inference being that appellant would not have intentionally harmed the victim, and the bruises on the victim's body could have been caused by incorrectly performed CPR efforts to save her life rather than from an intentional act by appellant. *See id.* at 258.

During its examination of whether evidence of prior injuries to the infant victim while in the defendant's care was relevant to the element of intent, the Court of Criminal Appeals considered it "crucial" that the defendant went beyond a simple plea of not guilty by advancing theories that would explain the infant's death. *See id.* at 261. The Court concluded that, through vigorous cross-examination and the presentation of defensive theories, the defendant put at issue his intent: "[W]e cannot say that the trial court would have been outside the zone of reasonable disagreement to have decided that the relationship evidence was relevant to [defendant's] intent." *See id.*

Here, we conclude the trial court did not abuse its discretion in deciding the burn evidence was relevant for the noncharacter conformity purpose of rebutting appellant's various defensive theories including the defensive theory that Christian merely stopped breathing. We also conclude the burn evidence was relevant to show appellant's prior relationship with Christian. We next determine whether the probative value of the burn evidence was outweighed by the danger of unfair prejudice.

The burn was important to explain the nature of the relationship between appellant and Christian because appellant argued Christian spontaneously stopped breathing, he did not inflict Christian's injuries, and that even if he did so, he did not do so knowingly. Although several witnesses testified about the burn, it took minimal time to develop the evidence. The burn is

mentioned in less than eighty pages of a 1400-page record, and each time the burn was mentioned, the trial court gave a limiting instruction to the jury. In closing, the State did not dwell on the burn evidence, but asked the jury to consider the evidence for the purpose of deciding appellant's intent on the day Christian stopped breathing, lack of mistake, and lack of accident.

The testimony and photograph of the burn was not so graphic that it would have impressed the jury in an irrational, yet indelible way, and it was not as disturbing as the testimony about the injuries that caused Christian's death. Finally, the State had a compelling need for the evidence because its case was entirely circumstantial. Thus, after balancing the Rule 403 factors, we conclude the trial court did not abuse its discretion by overruling appellant's objection to the burn evidence.

## CONCLUSION

We overrule appellant's issues on appeal and affirm the trial court's judgment.

Sandee Bryan Marion, Justice

Do not publish